Filed 2/19/21  Guzman v. Allstate Indemnity Co. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DELINA GUZMAN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ALLSTATE INDEMNITY COMPANY, <br><br> Defendant and Appellant. | D075688 <br><br><br> (Super. Ct. No. 37-2015-00018523-CU-BC-CTL) <br><br><br> ORDER MODIFYING OPINION <br><br> NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed on February 8, 2021, be modified as follows:

1.      On page 21, first sentence of the last full paragraph, change "Allstate" to "Guzman" so the sentence reads:

> Guzman does not persuade us that the court abused its
> discretion.

2.     On page 21, second sentence of the last full paragraph, change "it" to "she" so the sentence reads:

> Guzman offered testimony that Allstate hired doctors solely for the purpose of defeating Guzman's claim, and she listed individuals Allstate did not interview.

3.     On page 22, lines 5-7 of footnote 4, change "Allstate" to "Guzman" so the sentence reads:

> Guzman responded that Richard Cosand's "fingerprints [were] all over the file," and he was a manager.

4.     On page 24, the first full paragraph, the last sentence, change "economic" to "noneconomic" so the sentence reads:

> Any of these explanations provides a valid reason for awarding no noneconomic damages.

There is no change in the judgment.

HUFFMAN, Acting P. J.

Copies to:  All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DELINA GUZMAN, | D075688 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2015-00018523-CU-BC-CTL) |
| ALLSTATE INDEMNITY COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

White & Amundson, Daniel M. White; Lack Law Group and Rebecca D. Lack, for Plaintiff and Appellant.

Sheppard Mullin Richter & Hampton, Peter H. Klee, Karin Dougan Vogel and Matthew G. Halgren, for Defendant and Appellant.

INTRODUCTION

In February 2009, Delina Guzman suffered injuries in an automobile accident, for which she was not at fault.  She sought underinsured motorist coverage (UIM) from her insurer, Allstate Indemnity Company (Allstate). While that matter was pending, Guzman was injured in a second automobile

accident on January 20, 2010, for which Guzman also was not at fault. Guzman filed a second UIM claim with Allstate. Allstate began investigating Guzman's injuries after her formal demand in 2012. By 2014, Allstate had not settled the matter, so Guzman filed for arbitration, which increased her attorney fees. The arbitrator awarded Guzman the full limits on the policy. Guzman then sued Allstate for breach of the implied covenant of good faith and fair dealing, or bad faith. Following trial, the jury awarded Guzman economic damages but no noneconomic damages.

Guzman timely filed this appeal, contending (1) the special verdict form separated language for economic and noneconomic damages, improperly emphasizing proximate cause requirements for noneconomic damages; (2) Allstate engaged in misconduct by blaming Guzman's attorney for delays in payment and any resulting emotional distress; (3) the court improperly denied portions of two motions in limine by permitting photographs of the automobile accidents to be shown to the jury; (4) the court erroneously denied her requests to conform the complaint to evidence of punitive damages presented at trial; and (5) the court erroneously denied Guzman's motion for new trial because she presented uncontroverted evidence of emotional distress. Allstate filed a cross-appeal, arguing (1) the court improperly denied its motion for summary judgment on the bad faith claim, and (2) Guzman suffered no net financial loss and therefore failed to meet an elemental requirement for proving bad faith. We conclude that Guzman forfeited her challenges to attorney misconduct and the motions in limine. Further, we conclude none of these contentions has merit, and we affirm.

## BACKGROUND AND PROCEDURAL FACTS

On February 9, 2009, 17-year-old Delina Guzman hit a vehicle that turned left in front of her. She sustained some bodily injury that required treatment.

Guzman reported the accident to Allstate, and on February 16, 2009, Allstate sent Guzman a letter requesting she sign an authorization that would allow Allstate to obtain her medical records to evaluate her injuries. Guzman did not return the requested authorization.

Guzman retained an attorney, Donna Eyman, who sent Allstate a letter August 10, 2010 that enclosed proof of Guzman's settlement with the other driver for the $15,000 limit; she also gave notice that Guzman would make a UIM claim for the accident. She indicated she would supply a demand letter with supporting documentation.

On August 19, 2010, Allstate requested signed medical and wage authorizations from Guzman. The same day, Allstate sent Eyman a letter asking her to forward medical authorizations "and/or provide [her] client's current status and providers." Richard Salinas, the original claims adjuster, testified that Guzman had a choice of providing the authorization or providing medical information. On August 31, Allstate spoke with Eyman and learned that Guzman was receiving treatment from a chiropractor, a neurologist, and a neuropsychologist.

In the meantime, on January 20, 2010, Guzman was involved in a second automobile accident in which she was rear-ended. The at-fault driver in this accident was also insured for minimum limits of $15,000.

On April 7, 2011, Eyman submitted Guzman's UIM claim for the second accident.

3

On April 11, 2011, Eyman informed Allstate that Guzman had suffered a concussion and was being treated by a neuropsychologist for a traumatic brain injury. That day, Allstate mailed Eyman a letter acknowledging receipt of the second UIM claim, asking for a list of medical providers, medical bills, reports, and notes, and enclosing medical and wage authorization forms. Guzman did not return the authorizations.

On June 20, 2011, Allstate left Eyman a phone message inquiring about Guzman's treatment status and asking about the promised demand package. Allstate also requested the authorization form again. Allstate left a message on August 8, 2011, asking about treatment status and any new medical provider information.

In September and November 2011, Eyman contacted Allstate and informed it that Guzman was still receiving treatment and Eyman was working on a specific demand.

On January 3, 2012, Allstate left a message for Eyman requesting treatment updates and seeking medical and wage authorizations. On January 18, 2012, Eyman told Allstate she was continuing to work on the case; although she did not make a specific demand or provide specific medical records at that time, she provided a treatment update. On February 21, Eyman left a message updating Allstate on Guzman's status and indicating she would likely make a global demand to cover the expenses from both accidents.

On April 17, 2012, Guzman submitted a global settlement demand for $85,000 for each accident, an amount that took into consideration the UIM limit minus the funds she had received from the motorists' insurance. Medical records were enclosed with the demand.

Allstate denied the demand.  On May 16 and May 24, 2012, Allstate sent letters seeking to depose Guzman and hold an independent medical exam (IME), and it sought a medical record review to evaluate Guzman's injuries.

On June 19, 2012, Allstate asked Guzman to waive the statutory notice requirements and proceed with a deposition and the IME within 30 days. Eyman agreed to waive the statutory time requirements.  Allstate retained an independent orthopedic surgeon, who conducted an IME November 26, 2012.

Guzman's deposition was scheduled for November 29, 2012.  Eyman told Allstate that Guzman was experiencing cognitive and physical impairments, had anxiety about driving, and had no money for gas or access to a car, and she asked that the deposition be held in San Diego instead of Temecula, closer to where Guzman lived.  Allstate rescheduled the deposition.

On January 10, 2013, Allstate received the records and report from the IME.  The doctor had no opinion about Guzman's neurological symptoms, which fell outside his area of expertise.

Allstate deposed Guzman January 21, 2013.

Allstate then noticed an IME with neuropsychologist Dr. Philip Stenquist for March 20, 2013.  Eyman telephoned Allstate to inform it of defects in the notice and eventually offered the objections in writing, more than 20 days after receiving notice.  The IME notice should have been for a mental health exam, but it was for a physical exam.  It stated Guzman should expect to remove her clothing and should expect "palpation, inspection, [and] measurement," which Eyman noted was an improper scope for a mental health exam.

Allstate renoticed the IME for May 8, 2013. When Allstate called Eyman to confirm the date a few days before, Eyman said she had not received the notice. Allstate rescheduled the IME for July 23, 2013. Following the IME, Dr. Stenquist sought raw data from Guzman's treating neuropsychologist to complete his report, so Allstate sent a request for medical authorization on July 26, 2013, which Guzman signed. Eyman testified she sent the authorization to Allstate in August via fax,[1] but Allstate's records indicated it received the requested authorization December 31, 2013.

On February 12, 2014, Guzman's neuropsychologist contacted Eyman about a request for raw data. By March 7, 2014, Allstate had not received the raw data from Guzman's neuropsychologist, so it canceled the mediation scheduled for March 10.

On March 31, 2014, arbitration was triggered, scheduled for May 2, 2014. Once arbitration was triggered, a provision in the agreement between Guzman and Eyman required an increased contingency fee to 40 percent instead of 33 and 1/3 percent, a difference of $11,333.34.

In the first half of April 2014, Guzman's neuropsychologist provided Allstate's neuropsychologist with the raw data. Dr. Stenquist reported to Allstate that he could not allocate the cognitive injuries to each UIM claim without reviewing Guzman's pre-accident medical records. So, Allstate allocated the cognitive impairment and all related symptoms to the first accident and offered full policy limits, $85,000, to settle that claim on April 25, 2014, and Guzman accepted the offer. On April 29, Allstate offered Guzman $8,000 to settle the claim for the second accident. Guzman rejected this offer.

---

[1] Allstate challenged the veracity of Eyman's testimony on this point.

The arbitrator awarded Guzman $85,000 for the second accident.

On June 3, 2015, Guzman sued Allstate for breach of contract and breach of the implied covenant of good faith and fair dealing, i.e., bad faith. Allstate moved for summary judgment, a motion the court denied. However, the court granted Allstate's motion for summary adjudication of Guzman's associated punitive damages claim.

The case proceeded to a jury trial. Near the end of trial, Guzman made a motion to amend the complaint to conform to proof to revive the punitive damages claim. The court denied the motion.

The jury awarded Guzman $16,803.34 in economic damages and no noneconomic damages.

Guzman filed a motion for new trial or additur, which the trial court denied.

Guzman appealed, and Allstate cross appealed.

DISCUSSION

I

JURY VERDICT FORM

A. *Additional Facts*

The court used jury instruction CACI No. 2331, which stated in relevant part:

> "Ms. Guzman claims that Allstate breached the obligation of good faith and fair dealing by delaying payment of benefits due under the insurance policy. To establish this claim, Ms. Guzman must prove all of the following:
>
> "1) That Ms. Guzman suffered a loss covered under an insurance policy with Allstate;
>
> "2) That Allstate was notified of the loss;

7

"3)  That Allstate unreasonably delayed payment of policy benefits;

"4)  That Ms. Guzman was harmed; and

"5)  That Allstate's delay in payment of policy benefits was a substantial factor in causing Ms. Guzman's harm."

The parties each supplied the court with special verdict forms.  Guzman's version of the form mirrored CACI VF No. 2301, which begins with a series of questions about whether the plaintiff suffered a loss, then turns to the delay in payment, and finally provides for a single question regarding economic and noneconomic damages, followed by the calculations:

"5.  Was Allstate's delay in payment of policy benefits a substantial factor in causing harm to Ms. Guzman?

"_____ Yes              _____ No

"If your answer to question 5 is yes, then answer question 6.  If you have answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

"6.  What are Ms. Guzman's damages?

    "A.  Past Economic Loss        $ _____

    "B.  Past Non-Economic Loss  $ _____

                "TOTAL    $ _____"

The special verdict form actually used at trial began with two questions about Allstate's delay in payment, then separately addressed causation for economic and noneconomic damages:[2]

---

[2]    In the original version proposed by Allstate, jurors were instructed to answer no further questions if they answered "no" to number 4.

"3.  Was Allstate's unreasonable or improper delay in the payment of policy benefits a substantial factor in causing *economic* harm to Ms. Guzman?

"\_\_\_\_ Yes          \_\_\_\_ No

"If your answer to question 3 is 'yes,' then answer question 4.  If you answered 'no,' stop here, answer no further questions, and have the presiding juror sign and date this form.

"4.  Was Allstate's unreasonable or improper delay in the payment of policy benefits a substantial factor in causing *non-economic* harm to Ms. Guzman?

"\_\_\_\_ Yes          \_\_\_\_ No

"Please answer the next question.

"5.  What are Ms. Guzman's damages?

      "A. Past Economic Loss          $ _____

      "B. Past Non-Economic Loss   $ _____

                      "TOTAL    $ _____ "

The trial court commented that the two forms differed because one did not reference "substantial factor" for each type of damage, and the court's preference was to have it "broken down."  The court explained it previously had a verdict challenged on appeal because the verdict did not break down the damages.  Guzman's attorneys argued the court should use CACI VF No. 2301 because economic and noneconomic damages were separate line items, addressing the court's concern.  The court responded, "I just prefer it this way, Counsel," and counsel replied, "Understood, sir."

9

The jury answered "yes" to question 3 (Allstate's delays caused economic harm) and "no" to question 4 (Allstate's delays caused noneconomic harm).  The jury awarded $16,803.34 in past economic loss and $0 for past noneconomic loss.

## B.  *No Forfeiture*

Allstate contends that Guzman forfeited her ability to challenge the form on appeal because she did not object at trial and further contends the instruction accurately reflects the law and therefore was proper.

"A party who fails to object to a special verdict form ordinarily waives any objection to the form." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530.)  However, forfeiture is not automatic if the record indicates the failure to object was not for the purpose of gaining a technical advantage or engaging in a litigious strategy.  (*Ibid.*)

Here, although Guzman's attorneys did not use the words, "I object," the discussion on the record demonstrates their disagreement with the use of Allstate's special verdict form.  After the court told them its preference and asked if the parties were comfortable, Guzman's attorneys disagreed with the decision, until the court finally concluded "I just prefer it this way."  The issue was preserved for appeal.

## C.  *Special Verdict Form*

Guzman argues she was prejudiced by the verdict form because it improperly emphasized a causation requirement for noneconomic damages.  We disagree.

We "analyze the special verdict form de novo" (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678) and determine whether it

10

correctly states the law it intends to apply (*Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 366).

Guzman contends that once the jury concluded delay of payment was a substantial factor in causing harm, it should have calculated economic damages, then noneconomic damages. In essence, she maintains that asking the jury to consider whether the delays were a substantial factor in causing economic harm separately from whether delays were a substantial factor in causing noneconomic harm misled the jury by indicating economic and noneconomic harm were separate legal claims.

There is no separate cause of action for emotional distress caused by a delay in payment in a bad faith case (*Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 128) because the emotional distress damages in bad faith actions flow from or are incidental to the economic damages. (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1215-1216 (*Major*)). Thus, the insured can recover for emotional distress damages that flow from the breach because the mental suffering is an aggravation of the financial damages. (*Gourley*, at p. 129.) Although a plaintiff can recover for " 'all emotional distress proximately caused by the insurer's bad faith without proving any causal link between the emotional distress and the financial loss' " (*Clayton v. United Servs. Auto. Ass'n* (1997) 54 Cal.App.4th 1158, 1161, quoting *Waters v. United Services Auto. Assn.* (1996) 41 Cal.App.4th 1063 (*Waters*)), there is still a proximate cause requirement because the " 'emotional distress is the anxiety arising from the financial deprivation traceable directly to nonpayment of the claim.' " (*Major*, at p. 1215, citing *Silberg v. Cal. Life Ins. Co.* (1974) 11 Cal.3d 452.)

The special verdict form used in this case did not misstate the law or mislead the jury because proximate cause is a requirement. (See *Major*,

11

*supra*, 169 Cal.App.4th at p. 1215.) It asked jurors to first determine the existence of economic damages. Then, after that threshold requirement was met, it asked jurors whether the delay was also the proximate cause of noneconomic damages. Guzman's challenge implies that any time there is economic harm, a jury must also award damages to compensate for any emotional distress. But that is not the law. If a plaintiff's emotional distress is not derived from the delay in payment but instead caused by some other act, it would be proper for a jury to deny noneconomic damages. That is what the special verdict form allowed for in this case.

Guzman suggests that because there was a second question specifically addressing noneconomic damages, it is not clear whether the jury concluded Guzman did not *experience* emotional distress or whether the jury determined that the delay was not the *proximate cause* of emotional distress. But in either instance, it would be proper to exclude noneconomic damages.[3] Accordingly, we cannot conclude the special verdict form incorrectly stated the law.

## II.

## CLOSING ARGUMENT

Guzman contends that Allstate engaged in misconduct by blaming Guzman's attorney for the delay in payment and for the resulting emotional

---

[3] Guzman also contends, in connection with this issue, that she proved with substantial evidence that Allstate's delay was a substantial factor in causing noneconomic damages. The proper standard for evaluating the propriety of a jury's factual finding is not whether the appellant provided substantial evidence to support her position, but rather whether there is substantial evidence to support the jury's verdict, notwithstanding the existence of contrary or contradictory evidence supplied by an appellant. (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 369.) We address the evidence regarding emotional distress *post*.

distress. Allstate maintains there was nothing improper about its closing argument, and even if there were, Guzman forfeited the ability to challenge it by failing to object at the time.

## A. *Additional Facts*

Allstate's theory was that Eyman, not Allstate, caused delays, and that any emotional distress was therefore derived from Eyman's actions.

Eyman testified that she apprised Allstate of Guzman's treatment and provided information about Guzman's medical providers. Although she provided the information, she directed Guzman not to sign the medical and wage authorization forms because she found them objectionable. Eyman believed they were overbroad and nonspecific, and they infringed on Guzman's constitutional right to privacy by opening up Guzman's entire medical history, including information irrelevant to the accidents, and by permitting redisclosure of Guzman's personal information. Eyman also believed she could provide Guzman's status and supply information about the medical providers to meet Allstate's needs, and she noted that forms offered in connection with the second accident included a statement that it was the insured's decision whether or not to sign them.

Eyman further testified that she had numerous conversations with Guzman about how Allstate handled the claim. Guzman asked when Allstate would settle the matter, and Eyman told her repeatedly that she was doing what she could, but nothing was happening. Guzman could not understand why it was taking so long to receive funds from Allstate. She cried as she told Eyman she felt like Allstate was intentionally trying to slow down everything; she felt like a joke, and she was losing hope. Eyman told Guzman that Allstate had acted unreasonably by not paying the policy limits on the claims within the 30-day deadline Eyman had imposed on the demand.

13

Guzman had told Eyman she felt intimidated about meeting Allstate's neuropsychologist at a hotel. And she told Eyman she was worried about her medical bills because she had never owed money before and was concerned about being responsible for them. Eyman acknowledged during her deposition that it was reasonable for Allstate to have Guzman examined by its own doctors before paying policy limits for both claims, but when Allstate's attorney asked if Eyman had created some of Guzman's stress, Eyman said, "Absolutely not."

During closing arguments, Allstate's attorney argued that Guzman's life had changed because of the accident, not because of anything Allstate had done or not done. He said that if the jury was considering emotional distress, it should consider Eyman's role in Guzman's emotional distress. He pointed out that Eyman had admitted to telling Guzman that Allstate was mistreating her by not paying within 30 days of her demand, but Eyman had also admitted it was appropriate to not pay within 30 days because there were still things to be done in this case. Allstate's attorney told the jury the only information Guzman had was the information Eyman was telling her, and it was Eyman that told Guzman numerous times that Allstate was being unfair. He commented, "No wonder Ms. Guzman has got some emotional distress. But is that caused by Allstate or is that caused by her attorney making a statement that her attorney acknowledged under oath on the witness stand was not true?"

In rebuttal, Guzman's attorney pointed out that there *was* a delay in paying out the claims, and Eyman had merely conveyed the truth to her client, which she was obligated to do. He argued that Allstate was irresponsible to argue an attorney sharing her honest opinion with her client

14

was the cause of the client's injury when it was Allstate's action and inaction that was the cause.

After the verdict was returned, Guzman requested a new trial, pointing to Allstate's closing argument as one basis for the request. Guzman's attorney argued Eyman was under an affirmative duty to keep the client informed, and that at best Eyman's comments had a minor impact but did not constitute a substantial factor of Guzman's emotional distress. Guzman's motion for new trial also recognized that "the core of defense counsel's argument was about Ms. Eyman's disclosures to her client of Allstate's delays in handling Guzman's UIM claims." But Guzman's attorney argued this was improper because those disclosures were required by law.

### B. *Analysis*

Attorney misconduct is an irregularity in the trial and a basis for a new trial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.) "[A] trial judge is accorded wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal." (*Id.* at pp. 871-872.) In reviewing an order denying new trial, we review the entire record to make an independent determination regarding whether the error was prejudicial. (*Id.* at p. 872; *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 296, fn. 16 (*Bigler-Engler*).)

A claim of attorney misconduct usually requires a timely and proper objection, accompanied by a request for admonition to preserve it for appeal. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 794-795 (*Cassim*); *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 319; *Bigler-Engler, supra,* 7 Cal.App.5th at p. 295.) If the court's action is not requested, the alleged misconduct is not considered on appeal unless an admonition to the jury would have been inadequate. (*Cassim*, at pp. 794-795; *Bigler-Engler*,

15

at p. 295; *Horn v. Atchison, T. & S. F. R. Co.* (1964) 61 Cal.2d 602, 610-611 (*Horn*); *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148.)

Although Guzman challenged the substance of Allstate's closing argument in the motion for new trial and responded during the rebuttal argument, Guzman's attorney did not object to Allstate's argument at the time it was made. And Guzman does not explain why an objection at the time of trial would have been futile or ineffective. Accordingly, any challenge to it was forfeited. (See *Cassim*, *supra*, 33 Cal.4th at pp. 794-795; *Horn, supra*, 61 Cal.2d at pp. 610-611.)

Moreover, Allstate's alternate causation argument was not misconduct. Attorney misconduct typically involves dishonesty, or attempting to persuade the jury using deceptive methods. (*People v. Parson* (2008) 44 Cal.4th 332, 359.) However, attorneys have wide latitude to discuss the case during closing arguments and can state fully their views as to what the evidence shows and what conclusions to draw therefrom. (*Cassim*, *supra*, 33 Cal.4th at p. 795.) " ' "An attorney is permitted to argue all reasonable inferences from the evidence, . . . ." [Citation.]' " (*Id.* at p. 795.)

Allstate's defense was that it did not delay payment or act in bad faith because its investigatory process and decision-making could be explained by Eyman's actions and inactions. This was not a surprise to Guzman's attorneys, as it was the focus of Allstate's case, and Guzman challenged this theory by offering evidence to explain Eyman's choices in handling the matter and her reasons for her statements to Guzman. Further, Guzman does not supply us with any law to support her contention that identifying actions of opposing counsel as an alternative cause constitutes misconduct. We cannot conclude under the facts of this case that the court's denial of a new trial was erroneous.

16

III.

MOTIONS IN LIMINE

Guzman argues the court abused its discretion by failing to grant two motions in limine without qualification. Allstate argues the challenged evidence was relevant to explain the delays in payment because it provided context to show why Allstate had acted reasonably in light of the information available to it at the time. Allstate also argues Guzman forfeited the challenge because Guzman did not object at trial, did not argue Allstate was out of compliance with the rulings on the motions in limine, and relied improperly on a juror's declaration to conclude that the evidence admitted prejudiced the jury.

A. *Additional Facts*

Before trial, Guzman filed motion in limine No. 6, seeking to exclude references to any evidence that placed the value of the UIM claims at issue and motion in limine No. 7, seeking to exclude references to biomechanical evidence that the nature and force of the accidents could not have caused the claimed injuries. Neither motion mentioned photographs specifically.

The trial court agreed that neither the value of the claims nor the biomechanics of the accident were relevant to determining whether Allstate acted in bad faith. However, it concluded that some of that information was relevant to explain why Allstate followed the process it did in investigating Guzman's claims. Accordingly, the court permitted limited photographic evidence to aid in Allstate's explanation of its process.

B. *Analysis*

We review a trial court's ruling on motions in limine for an abuse of discretion. (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295.) We presume an order by the trial court is correct (*Denham v. Superior*

17

*Court* (1970) 2 Cal.3d 557, 564), and it is the appellant's burden to affirmatively demonstrate error. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822.)

The motions in limine did not seek to exclude photographs of the accident, and Guzman did not challenge their inclusion as irrelevant or unduly prejudicial when they were introduced at trial. As Allstate notes, the reasonableness of an insurer's decisions are based on its actions at the time they were made, not in retrospect. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347 (*Chateau Chamberay*).)

Guzman also does not argue that Allstate improperly referenced the photographs in a manner that would lead jurors to question the biomechanics of the accidents or that directed jurors to contemplate whether she had already received enough money. Allstate did neither.

Instead, Guzman focuses on information supplied by a juror about how jurors perceived the photographs during their deliberations. In his declaration, one juror explains that some jurors referenced the photo of Guzman's car and discussed whether Guzman could have actually been hurt to the extent she claimed, and whether she had already received enough money. However, the juror's declaration is inadmissible under Evidence Code section 1150, subdivision (a), and we do not rely on it. Furthermore, the court's decision to admit the photographs for the limited purpose for which they were actually used could not have been informed by the jury's apparent misuse of the information later on, particularly given that Guzman did not object to the admission of the information or seek a limiting instruction of some kind. This was not an abuse of discretion.

18

# IV

## PUNITIVE DAMAGES

Guzman contends the trial court erred by denying her request to conform the complaint to evidence regarding punitive damages.

### A. *Additional Facts*

Before trial, the court granted Allstate's motion for summary adjudication on the issue of punitive damages. In its minute order, the court explained Guzman had failed to meet her burden to show oppression, malice, or fraud because she did not offer explanations for the payment delay that would give rise to such a finding. It did not comment on whether the alleged delays had been ratified by an officer, director or managing agent, although Allstate made that argument in its request for summary adjudication. (See Civ. Code, 3294, subds. (a), (b).)

At the close of trial, Guzman sought to revive the punitive damages claim by conforming the complaint to the evidence. Guzman argued Allstate had hired its own orthopedist and neuropsychologist for the sole purpose of defeating the UIM claim. Guzman's attorney also argued a settlement offer for the second accident consciously disregarded Guzman's rights because it was based on a doctor's misstatement of Guzman's injuries. Finally, Guzman argued that Allstate's in-house counsel contributed to delays, and this information taken together demonstrated a conscious disregard for her rights.

Allstate countered that Guzman failed to show by clear and convincing evidence that Allstate had acted intentionally or consciously disregarded her rights in its actions. Allstate pointed to evidence showing the company moved the claim forward, and even if Allstate had contributed to the pace of the process, Allstate did not behave despicably. In particular, Allstate noted

that it believed it had fully compensated Guzman for the cognitive problems she experienced as part of its settlement of the first accident, so there was no evidence it intentionally attempted to deprive her of benefits she was owed due to the second accident. Allstate also argued there was no evidence the delays were known and ratified by a managing agent.

During trial, Allstate employee Richard Cosand testified. Cosand began working for Allstate as a litigation claims adjuster and was promoted to a managerial role after three years. As a claims service leader, he supervised 9 to 11 claims handlers working on UIM claims. He discussed strategies about the cases frequently and was sometimes involved in round table discussions about valuing a claim. His primary role was as a consultant rather than in valuing claims.

He supervised Richard Salinas, who handled the first claim. In that capacity, he asked Salinas's claims processor to obtain additional detail on the head injury and directed her to follow up to gather information after Eyman indicated she would be sending a demand. He consulted with Salinas before determining whether it should be handled by a special investigation handler because there were two different accidents with a similar injury, and he reviewed the file before transferring it to the litigation department. By the time an arbitration demand was made, another claims handler had taken over the case, someone he did not supervise.

The court denied the motion to conform to proof.

B. *Analysis*

We review a trial court's denial of a motion for leave to amend a complaint for abuse of discretion. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.)

Punitive damages are available if a jury finds by clear and convincing evidence that a defendant committed malice, fraud, or oppression. (Civ. Code, § 3294, subd. (c)(2).) To meet this burden, the evidence demonstrating malice, fraud, or oppression must have been strong enough " ' "to command the unhesitating assent of every reasonable mind" ' " and must also have been inconsistent with the theory that Allstate's actions were the result of mistake, honest error in judgment, or even negligence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.)

Guzman maintains that Allstate acted with oppression because its conduct was "despicable" and subjected her to "cruel and unjust hardship in conscious disregard of [her] rights." (Civ. Code, § 3294, subd. (c)(2).) "Despicable" conduct is that which is "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." (*Steward v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 483, fn. 29.)

Allstate does not persuade us that the court abused its discretion. Guzman offered testimony that Allstate hired doctors solely for the purpose of defeating Guzman's claim, and it listed individuals Allstate did not interview. She argued Allstate ignored Guzman's doctors' opinions, failed to hire a neurologist and did not directly question Guzman's neuropsychologist, that Allstate relied on incomplete medical information, delayed getting certain medical examinations or canceled them, undervalued claims, failed to take into consideration lost wages, misstated injuries, and misstated the

status of the claims to Guzman's attorney. But Allstate presented evidence at trial to explain or justify these complaints, showing why they do not demonstrate maliciousness or oppression. For example, Allstate points to evidence that Guzman did not provide the names of the witnesses, that her doctors' opinions were considered, that the neuropsychology evaluation was the most appropriate examination, and that it used incomplete information only because Guzman supplied incomplete information. Allstate also offered evidence that Eyman contributed to delays and cancelations, and that Allstate did not depress or devalue Guzman's injuries; it allocated them to the first accident. And Allstate provided testimony that Allstate did not misrepresent the status of the claims, because its investigation was ongoing. Given the conflicting evidence before the trial court, we cannot say it abused its discretion to conclude Guzman had not met the requisite clear and convincing standard.[4]

---

[4] Guzman's argument before the trial court focused on whether Allstate's actions demonstrated a conscious disregard for Guzman's rights. Allstate argued that Guzman had failed to meet this standard by clear and convincing evidence. But Allstate also argued there, as it does in its respondent's brief here, that no managing agent had ratified Allstate's conduct. Allstate responded that Richard Cosand's "fingerprints [were] all over the file" and he was a manager. The court explained that it had reviewed the testimony and the complaint and was well aware of the standard of proof required. Then it denied the motion. Guzman only addresses ratification by a managing agent in reply to Allstate's argument that its conduct was not ratified by a managing agent, as required. (See Civ. Code, § 3294, subds. (a), (b); *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 714.) Although Allstate challenged whether Cosand demonstrated the necessary substantial independent authority (see *White v. Ultramar* (1999) 21 Cal.4th 563, 566-567), the trial court did not make any factual finding regarding ratification.

V.

REQUEST FOR NEW TRIAL

Guzman separately argues the court erred by failing to grant a new trial because she provided uncontested evidence of emotional distress, entitling her to those damages.

Although Guzman has framed the issue as challenging the amount of damages received, arguing there is substantial evidence to support her request for emotional distress damages, we are tasked with determining whether the trial court's denial of a motion for new trial was erroneous. We review such a denial for abuse of discretion. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415 (*Rayii*).) We reverse the denial of a new trial motion based on inadequate damages if there is "no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Id.* at p. 1416.) We view the facts in the light most favorable to the prevailing party and draw all reasonable inferences in favor of the judgment. (*Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645.)

Code of Civil Procedure section 657, subdivision (5) authorizes a new trial if the trial court is convinced after weighing the evidence that the jury "clearly should have reached a different verdict or decision." Civil Code section 3333 entitles a party to damages that compensate for all injury proximately caused by a defendant's tortious act. (See *Haskims v. Holmes* (1967) 252 Cal.App.2d 580, 586 (*Haskims*).)

However, a jury may refuse to award damages when the claim depends on subjective evidence and witness credibility. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 453-454.) And a jury may reject a witness's uncontroverted testimony as long as the jury does not do so arbitrarily. (*Graf v. Marvin Engh Truck Co.* (1962) 207 Cal.App.2d 550, 555.) A jury can also opt not to

23

award noneconomic damages if it concludes such damages are trivial or transitory (*Lee v. Bank of Am.* (1990) 218 Cal.App.3d 914, 920), and it can decline to award damages if it concludes an element, like causation, is not proved. (See *Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24-26 [jury has fact-finding power and is not required to find causation].)

Here, the jury was asked to determine both the existence of emotional distress and, if it existed, evaluate its proximate cause. The special verdict form shows the jury did not believe Guzman deserved noneconomic damages. This could have been because the delayed payments were not a substantial factor in creating emotional distress, or because the emotional distress damages were trivial or transitory, or the jury may have found the witnesses' testimony regarding emotional distress incidental to payment delays unpersuasive. Any of these explanations provides a valid reason for awarding no economic damages.

The trial court likewise concluded there was sufficient evidence that Allstate's conduct was not a substantial factor in causing emotional distress; thus, it was not clear the jury should have reached a different conclusion than it did. (See Code Civ. Proc., § 657, subd. (5); Civ. Code, § 3333; *Haskims, supra*, 252 Cal.App.2d at p. 586.) Even though there was testimony about emotional distress, there was controversy surrounding its cause; therefore, the evidence did not compel the conclusion that the motion should have been granted. (*Rayii, supra*, 218 Cal.App.4th at p. 1416.)

## VI.

### GENUINE DISPUTE DOCTRINE

Allstate contends in its cross-appeal that the trial court erred by denying its motion for summary judgment because there was a genuine

24

dispute over the UIM claims that should have barred the action as a matter of law. We disagree.

## A. *Additional Facts*

In its motion for summary judgment, Allstate emphasized that the parties disagreed about the cause and extent of Guzman's injuries and argued it would have been improvident to approve the claim before it verified the amount. Allstate argued that Guzman delayed in making UIM claims, waited to make a demand or provide any supporting documentation, refused to provide medical authorizations until 2013, and stalled efforts to depose her.

Guzman submitted declarations from Eyman and from an expert, Rob Dietz, among others. Eyman explained the first request she received for medical and wage authorizations was in August 2010. However, she objected to the language contained in the August 2010 authorization forms as an overreach beyond the terms of the insurance policy which gave Allstate access to information otherwise protected through HIPAA and allowed redisclosure of Guzman's personal medical information. Eyman provided information about Guzman's treating doctors that month, and she provided periodic telephonic updates regarding the nature of Guzman's injuries, her treatment progress, and the names of her treating doctors. Allstate never informed her this was insufficient or indicated her failure to sign the specific authorization forms could lead to a rescission of the contract.

When Eyman received a request for wage and medical authorizations for the second accident on April 11, 2011, she objected to them on the same grounds as she had previously. There was also language in those authorization forms that stated Guzman was not required to sign them. However, Eyman continued to provide updates. Again, Allstate did not seek

25

information about the status of the authorizations or inform Eyman that failure to return the signed authorizations would result in denial of UIM benefits or rescission of the policy.

Eyman made a global demand for payment for both accidents on April 17, 2012, set to expire in 30 days, only after she understood the extent of Guzman's injuries. Allstate did not respond to the demand within 30 days, so the offer lapsed.

Eyman waived the statutory timeline for Guzman's deposition and agreed to expedited timelines, but she insisted the deposition and medical exam occur in San Diego because Guzman did not like to drive long distances and did not have a car for use. Despite Guzman's willingness to move forward even without formal notice for a deposition, Allstate canceled it.

Around February 14, 2013, Eyman received notice for a defense physical medical exam with Dr. Stenquist, although he was a neuropsychologist, and she objected to the location and the absence of a witness during the exam. She received a second notice for the exam on May 6, 2013, but Allstate had not addressed the objections, and she again objected. The exam went forward in July 2013 after Allstate corrected the language in the notice.

Around July 26, 2013, Allstate sought a medical authorization for the records managed by one of Guzman's doctors, which Guzman signed August 10, 2013 and sent August 12, even though Guzman had sent all the medical records from that doctor to Allstate previously. Eyman did not hear from Allstate in August, September, October or November 2013.

On March 7, 2014, Allstate canceled the mediation scheduled for March 10, 2014. Allstate claimed Dr. Stenquist had not completed his report from the July 2013 exam because he needed raw data from Guzman's treating

neuropsychologist's testing. On March 19, Eyman sent another request for policy benefits. The matter eventually proceeded to arbitration, where Guzman was awarded the maximum allowable award.

Dietz is a licensed independent insurance adjuster and public adjuster in the state of Washington.[5] His declaration stated that Allstate's authorizations overreached the conditions or requirements of the insurance policy, negating any reasonable expectation that the medical and wage authorizations would be signed, and he explained that were the authorizations important to the investigation, industry practice would have been to communicate the importance of the authorizations to the insured. He opined that Allstate also failed to conduct a thorough and objective investigation by failing to interview certain people and because it did not make a settlement offer for more than two years after Guzman requested the policy limit.

The court denied the summary judgment motion, recognizing that some delay could have been reasonable, but Allstate "did not offer anything for 4 years on the first accident." The court explained there was a factual dispute about whether Allstate acted reasonably in its investigation, as well as regarding the value of economic damages.

### B. *Legal Principles*

Summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The moving party bears the initial burden to make a prima facie showing of the nonexistence of a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-

---

[5] Allstate objected to Dietz's declaration, and the trial court overruled the objections.

851.) " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1035.) "We liberally construe the evidence in support of opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717 (*Wilson*).)

To meet its burden in a bad faith insurance claim and show the insurer breached the implied covenant of good faith and fair dealing, a plaintiff must show the insurer withheld benefits unreasonably and without proper cause. (*Rappaport-Scott v. Interinsurance Exchange of the Automobile Club* (2007) 146 Cal.App.4th 831, 837.) A simple difference in opinion or mistake in judgment is not bad faith; the conduct must be unreasonable. (*Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 931, fn. 12.)

Under the "genuine dispute doctrine," withholding or delaying insurance benefits is not unreasonable when there is a legitimate question about the existence of coverage or the amount due. (*Chateau Chamberay*, *supra*, 90 Cal.App.4th at p. 347.) It is not a court's role to determine which party is "right" about its dispute, only that the dispute is reasonable and legitimate. (*Id.* at p. 347, fn. 7.) In those circumstances, the only issue is whether the insurance company's position was objectively reasonable in light of the law that existed at the time. (*Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 974.)

However, the genuine dispute doctrine does not relieve an insurer from its obligation to thoroughly and fairly investigate, process, and evaluate the insured's claim; an insurer must proceed through its evaluation in good faith and on reasonable grounds. (*Wilson*, *supra*, 42 Cal.4th at p. 723.) "[A]n

28

insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." (*Amadeo v. Principal Mut. Life Ins. Co.* (9th Cir. 2002) 290 F.3d 1152, 1162.)

C. *Analysis*

The genuine dispute doctrine generally applies to situations when there is a legitimate question about the existence of coverage or the amount due. (*Chateau Chamberay*, *supra*, 90 Cal.App.4th at p. 347.) Allstate's focus on this doctrine asks us to view the dispute as one about Allstate's evaluation of the amount of coverage due in light of Guzman's injuries. To this end, Allstate's main focus in its motion for summary judgment was whether its actions regarding hiring medical professionals and investigating Guzman's injuries independently were reasonable. However, Guzman's bad faith claim did not challenge the existence of a dispute over the amount of coverage due, but instead challenged Allstate's actions as dilatory: Allstate unreasonably dragged out its investigation, breaching its duty.

Under these facts, whether Allstate acted reasonably or unreasonably in its investigation was a factual question, not a legal one. Allstate argued it was Guzman's fault the valuation took so long because she failed to provide medical and wage authorization signature, items to which Allstate argued it was entitled within 10 days of its request. Because Guzman did not supply the requested authorization, Allstate argued, her entitlement to policy benefits was stayed under the Insurance Code.

Guzman responded by explaining that the authorizations were unreasonable, overreaching, and sought information beyond the scope of the policy's terms. Dietz's declaration explained that Allstate could not reasonably expect Guzman to sign the authorizations in that form. Eyman

29

provided Allstate with information about Guzman's medical providers, information which Allstate's letters suggested could be an alternative to the authorization forms, and Allstate did not inform Eyman that it was insufficient to do so.

Because Guzman supplied evidence that explained that the missing medical authorizations were the result of Allstate supplying ones that were objectionable, then ignoring its ability to obtain the information through other means, there was a question as to whether Allstate acted reasonably at all. Reviewing this evidence liberally and construing it in favor of Guzman (*Wilson*, *supra*, 42 Cal.4th at p. 717), we conclude a jury could decide Allstate acted unreasonably, in breach of the implied covenant of good faith and fair dealing.

## VII.

## ECONOMIC LOSS

Allstate contends that the trial court incorrectly denied its motion for summary judgment because Guzman sustained no net economic damages. Although Allstate concedes Guzman paid additional attorney fees that she would not have paid had the claim resolved before proceeding to arbitration, Allstate's theory is that Guzman must prove net economic loss based on the judgment amount in comparison to her lowest settlement offer plus her increased attorney fees and arbitration costs.

### A. *Additional Facts*

On April 17, 2012, Guzman offered to settle her claims for $85,000 per accident, or $170,000 total. Allstate allowed the offer to lapse. In late November or early December 2012, Guzman made a statutory offer to compromise (Code Civ. Proc., § 998) for $150,000, or $75,000 per accident. Allstate rejected this offer.

Between its settlement of the first claim and the arbitration decision regarding the value of the second claim, Allstate paid $170,000.

Filing the arbitration increased Guzman's attorney fees from $28,333.33 per claim to $34,000 per claim, increasing the attorney's fees by $11,333.34. Guzman paid arbitration fees totaling $5,470, bringing the total expenses related to arbitration to $16,803.34.

B. *Analysis*

To prevail in a bad faith insurance claim, the plaintiff must provide evidence of actual financial loss. (*Waters*, *supra*, 41 Cal.App.4th at p. 1078.) Under certain conditions, attorney fees can be an economic loss: "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort." (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 (*Brandt*); see *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 659 [concluding the money spent for attorneys to recover for bad faith actions is an adequate financial loss to establish genuineness of a claim].)

Allstate cites to no legal authority for the proposition that the correct measure of economic harm is *net* financial loss, and we could locate none. The *Waters* case cited by Allstate references attorney fees and costs as possible evidence of economic harm. There, the parties settled the underlying homeowners' insurance claim so that the homeowners incurred no out-of-pocket repair expenses. (*Waters*, *supra*, 41 Cal.App.4th at pp. 1067-1069.) And the court concluded that because they did not offer proof that they had incurred any fees due to the insurer's delays, the homeowners suffered no financial loss. (*Id.* at p. 1081.) But the court also noted a reference in a post-

31

argument letter to a redacted contingency fee agreement that had not been presented at trial and commented that even if the fees referenced in the agreement were not recoverable, "proof of fees and costs would have at least provided some evidence of economic harm." (*Id.* at p. 1081, fn. 15.) This suggests a party can meet the economic harm requirement even if the financial loss is not one the plaintiff can recover.

Here, the claims were actually valued at $170,000, the amount Guzman recovered from Allstate. But she incurred additional costs, and those costs represent a financial loss because the increased attorney fees and arbitration costs were an expense Guzman would not have incurred had Allstate not delayed in its investigation. Thus, whether or not Guzman ultimately came out ahead under a net benefit analysis, she suffered a financial loss. Accordingly, it was an economic injury for which Allstate is liable. (See *Brandt, supra*, 37 Cal.3d at p. 817.)

## DISPOSITION

The judgment is affirmed. Parties will bear their own costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:



IRION, J.



GUERRERO, J.

32